1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                        **WESTERN DIVISION**

11

12  JOHN HEINZMAN,                    )    No. CV 14-5402-PLA
                                      )
13                  Plaintiff,        )
                                      )
14          v.                        )    **MEMORANDUM OPINION AND ORDER**
                                      )
15  CAROLYN W. COLVIN, ACTING         )
    COMMISSIONER OF SOCIAL            )
16  SECURITY ADMINISTRATION,          )
                                      )
17                  Defendant.        )
    _____   )
18

19                              **I.**

20                        **PROCEEDINGS**

21          Plaintiff filed this action on July 23, 2014, seeking review of the Commissioner's denial of

22  his applications for Disability Insurance Benefits ("DIB") and Social Security Income ("SSI")

23  payments.  The parties filed Consents to proceed before the undersigned Magistrate Judge on

24  July 25, 2014 and August 21, 2014.  Pursuant to the Court's Order, the parties filed a Joint

25  Stipulation on March 16, 2015, that addresses their positions concerning the disputed issues in

26  the case.  The Court has taken the Joint Stipulation under submission without oral argument.

27  /

28  /

## II.

## BACKGROUND

Plaintiff was born on May 18, 1962. [Administrative Record ("AR") at 27, 170.] He has past relevant work experience as an electrician, restaurant manager, and merchandise distributor. [AR at 27, 52.]

On April 10, 2012, plaintiff filed an application for a period of disability and DIB, and on February 12, 2013, he protectively filed an application for SSI payments, alleging in both applications that he has been unable to work since October 24, 2011. [AR at 16, 170-76, 182.] After his applications were denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). [AR at 16, 122-23.] A video hearing was held on June 11, 2013, at which time plaintiff appeared represented by an attorney, and testified on his own behalf. [AR at 36-59.] A vocational expert ("VE") also testified. [AR at 52-58.] On June 27, 2013, the ALJ issued a decision concluding that plaintiff was not under a disability from October 24, 2011, the alleged onset date, through June 27, 2013, the date of the decision. [AR at 16-29.] Plaintiff requested review of the ALJ's decision by the Appeals Council. [AR at 11.] When the Appeals Council denied plaintiff's request for review on May 15, 2014 [AR at 1-5], the ALJ's decision became the final decision of the Commissioner. See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted). This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (citation

1   and internal quotation marks omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998)

2   (same).  When determining whether substantial evidence exists to support the Commissioner's

3   decision, the Court examines the administrative record as a whole, considering adverse as well

4   as supporting evidence. Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (citation omitted);

5   see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must

6   consider the entire record as a whole and may not affirm simply by isolating a specific quantum

7   of supporting evidence.") (citation and internal quotation marks omitted).  "Where evidence is

8   susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan,

9   528 F.3d at 1198 (citation and internal quotation marks omitted); see Robbins v. Soc. Sec. Admin.,

10  466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the

11  ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.")

12  (citation omitted).

13

14                                                IV.

15                                **THE EVALUATION OF DISABILITY**

16          Persons are "disabled" for purposes of receiving Social Security benefits if they are unable

17  to engage in any substantial gainful activity owing to a physical or mental impairment that is

18  expected to result in death or which has lasted or is expected to last for a continuous period of at

19  least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.

20  1992).

21

22  **A.      THE FIVE-STEP EVALUATION PROCESS**

23          The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing

24  whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821,

25  828 n.5 (9th Cir. 1995), as amended April 9, 1996.  In the first step, the Commissioner must

26  determine whether the claimant is currently engaged in substantial gainful activity; if so, the

27  claimant is not disabled and the claim is denied. Id.  If the claimant is not currently engaged in

28  substantial gainful activity, the second step requires the Commissioner to determine whether the

                                                    3

1   claimant has a "severe" impairment or combination of impairments significantly limiting his ability

2   to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.

3   If the claimant has a "severe" impairment or combination of impairments, the third step requires

4   the Commissioner to determine whether the impairment or combination of impairments meets or

5   equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404,

6   subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If

7   the claimant's impairment or combination of impairments does not meet or equal an impairment

8   in the Listing, the fourth step requires the Commissioner to determine whether the claimant has

9   sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled

10  and the claim is denied.  Id.  The claimant has the burden of proving that he is unable to perform

11  past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie

12  case of disability is established.  Id.  The Commissioner then bears the burden of establishing

13  that the claimant is not disabled, because he can perform other substantial gainful work available

14  in the national economy.  Id.  The determination of this issue comprises the fifth and final step

15  in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin,

16  966 F.2d at 1257.

17

18  **B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

19          At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since

20  October 24, 2011, the alleged onset date.[1]  [AR at 18.]  At step two, the ALJ concluded that

21  plaintiff has the following severe combination of impairments:

22          [O]besity; degenerative joint disease of the left knee, status post arthroscopy and
        partial meniscectomy (January 2009) and status post medial compartment
23          replacement (August 2009); history of chronic tear of the interior talofibular ligament
        of the right ankle (resolved); degenerative changes of the lumbar spine, including
24          degenerative disc disease, mild-to-moderate facet arthrosis at L4-5, and minimal-to-
        mild disc bulges, but no evidence of persisting neuroforaminal stenosis, central
25          canal stenosis, or nerve root involvement; affective disorder; mood disorder; pain
        disorder associated with a general medical condition; and anxiety disorder.

26

27  _____

28          [1]    The ALJ concluded that plaintiff meets the insured status requirements of the Social Security
    Act through June 30, 2016.  [AR at 18.]

1   [Id. (citations omitted).]   At step three, the ALJ determined that plaintiff does not have an

2   impairment or a combination of impairments that meets or medically equals any of the impairments

3   in the Listings.  [AR at 19.]  The ALJ further found that plaintiff retained the residual functional

4   capacity ("RFC")[2] to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b),[3]

5   as follows:

6         [H]e is limited to standing and walking no more than 45 minutes at one time, without
          a change of position, and no more than 4 hours total in an eight-hour day; is limited
7         to climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling
          no more than occasionally; is precluded from climbing ladders, ropes, or scaffolds
8         and from working around hazards, such as unprotected heights and moving
          machinery; and must avoid concentrated exposure to temperature extremes.
9         [Plaintiff] is also limited to simple, routine, and repetitive tasks, involving no more
          than simple work-related decisions and a few workplace changes; no more than
10        occasional interaction with supervisors and coworkers and no more than occasional
          contact with the general public.  [Plaintiff] is also unable to perform work involving
11        fast-paced production requirements (defined as "constant activity, with tasks
          performed sequentially in rapid succession").

12

13   [AR at 20.]  At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded

14   that plaintiff is unable to perform any of his past relevant work as an electrician, restaurant

15   manager, or merchandise distributor.  [AR at 27.]  At step five, based on plaintiff's RFC, vocational

16   factors, and the VE's testimony, the ALJ found that there are jobs existing in significant numbers

17   in the national economy that plaintiff can perform, including work as a "small products assembler"

18   (Dictionary of Occupational Titles ("DOT") No. 706.684-022), "inspector/hand packager" (DOT No.

19   559.687-074), and "sorter" (DOT No. 569.687-022).  [AR at 28, 55-56.]  Accordingly, the ALJ

20   _____

21   [2]   RFC is what a claimant can still do despite existing exertional and nonexertional limitations.
     See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9thCir. 1989).  "Between steps three and four of the
22   five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the
     claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007)
23   (citation omitted).

24   [3]   "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
     objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this
25   category when it requires a good deal of walking or standing, or when it involves sitting most of the
     time with some pushing and pulling of arm or leg controls.  To be considered capable of performing
26   a full or wide range of light work, you must have the ability to do substantially all of these activities.  If
     someone can do light work, we determine that he or she can also do sedentary work, unless there are
27   additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20
     C.F.R. § 404.1567(b); see also 20 C.F.R. § 416.967(b).
28

determined that plaintiff was not disabled at any time from the alleged onset date of October 24, 2011, through June 27, 2013, the date of the decision.  [AR at 28.]

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ erred when he:  (1) rejected the opinions of plaintiff's treating sources, T. Sri Jaerajam, M.D. ("Dr. Sri"), Dr. Villanueva, and Michele Archambeault, Psy.D.; and (2) rejected plaintiff's subjective symptom testimony.  [Joint Stipulation ("JS") at 3, 4, 15, 24.] Plaintiff also contends that the Court should apply the credit-as-true standard.  [JS at 3, 37.]

As set forth below, the Court agrees with plaintiff, in part, and remands for further proceedings.

## A.    MEDICAL OPINIONS

### 1.    Legal Standard

"There are three types of medical opinions in social security cases:  those from treating physicians, examining physicians, and non-examining physicians."  Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 404.1502, 404.1527.  "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  Lester, 81 F.3d at 830; Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing Ryan, 528 F.3d at 1198); Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010).  "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician."  Lester, 81 F.3d at 830; Ryan, 528 F.3d 1198.

"[T]he ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on clear and convincing reasons."  Carmickle, 533 F.3d at 1164 (citation and internal quotation marks omitted); Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006). "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record."  Carmickle, 533 F.3d at 1164

1  (citation and internal quotation marks omitted); Ryan, 528 F.3d at 1198; Ghanim v. Colvin, 763

2  F.3d 1154, 1160-61 (9th Cir. 2014); Garrison, 759 F.3d at 1012.  The ALJ can meet the requisite

3  specific and legitimate standard "by setting out a detailed and thorough summary of the facts and

4  conflicting clinical evidence, stating his interpretation thereof, and making findings."  Reddick, 157

5  F.3d at 725.  The ALJ "must set forth his own interpretations and explain why they, rather than the

6  [treating or examining] doctors', are correct."  Id.

7

8      **2.    Dr. Sri and Dr. Villanueva**

9          Dr. Sri, plaintiff's treating physician [see, e.g., AR at 718-26], saw plaintiff on a "monthly"

10  basis since May 2012.[4]  [AR at 718-26, 826-36, 908-12, 914.]  Dr. Sri diagnosed plaintiff with

11  degenerative disc disease of the lumbar spine with protrusion of L4-L5, with nerve impingement,

12  and depression.  [AR at 914.]  Dr. Sri provided treatment with medication, referrals, and oversight

13  on blood work and chest x-rays.  [AR at 718-24, 826-27, 908-12.]

14          On July 11, 2012, Dr. Sri completed a Medical Source Statement -- Physical form.  [AR at

15  728-29.]  In that form, he opined that plaintiff could lift and/or carry ten pounds occasionally or

16  frequently; could stand and/or walk less than two hours in an eight-hour workday; could sit less

17  than six hours in an eight-hour workday; must alternate standing and sitting every twenty to thirty

18  minutes; could never climb or crawl; could occasionally balance, stoop, or crouch; could frequently

19  kneel; must change position every thirty to forty minutes; and had restrictions around heights and

20  temperature extremes.  [Id.]  Dr. Sri stated that his findings of "L knee replacement" and "DDD

21  [degenerative disc disease] L-spine L4-5" supported his lifting and/or carrying restrictions, and

22  "DDD [degenerative disc disease] lumbar spine, [b]ulging disc L4-5" supported his assessment

23  that plaintiff must alternate standing and sitting every twenty to thirty minutes.  [Id.]

24          On April 25, 2013, Dr. Sri completed a Medical Source Statement of Ability to do Work

25

26      [4]    Although Dr. Sri's Medical Source Statement, dated April 25, 2013, indicates that he started
seeing plaintiff in August 2012 [AR at 914], Dr. Sri's Medical Source Statement, dated July 11, 2012,
27  indicates that he started seeing plaintiff in May 2012 [AR at 729], and treatment records go back to
May 30, 2012 [AR at 719.]  Treatment records indicate that Dr. Sri saw plaintiff seven times from May
28  30, 2012, through March 22, 2013.  [AR at 718-19, 826-28, 908-09.]

1    Related Activities (PHYSICAL) form.  [AR at 914-16.]  In that form, he opined that plaintiff could

2    walk three blocks; could sit for twenty minutes at one time, stand for ten minutes at one time, and

3    sit and stand/walk for a total of one hour in an eight-hour workday; must "consistantly" [sic] take

4    unscheduled breaks to lie down for twenty to thirty minutes during a workday; could occasionally

5    lift and carry less than ten pounds; could rarely lift and carry ten pounds; could occasionally

6    balance; could rarely twist, stoop, crouch/squat, climb ladders, climb stairs, or kneel; could

7    occasionally handle; could rarely finger or reach; would be "off task" for twenty-five percent or

8    more of the workday; and would be absent from work due to his impairments or treatment more

9    than three days.[5]  [Id.]  Dr. Sri identified his clinical findings and signs as follows:  "[Plaintiff] is not

10   happy, affect is abnormal.  Pain in back causing antalgic gait.  [Plaintiff] unable to sit still due to

11   pain."  [AR at 914.]  Dr. Sri identified plaintiff's symptoms as follows:  "Back: pain radiating into

12   both legs, pain aggravates sleep, fatigue 2° lack of sleep/pain" and "Depression: recent break

13   down 2/13; loss of interest, fatigue, insomnia."  [Id.]  Dr. Sri described plaintiff's treatment as

14   follows: "[Plaintiff] has slight improvement with anti-depressant but still has moderate depressive

15   symptoms.  [Plaintiff] on chronic pain medication for his back which causes fatigue and lack of

16   energy."  [Id.]

17          The ALJ gave "little weight" to the opinion of Dr. Sri that plaintiff would be incapable of

18   performing even a substantial range of sedentary work [AR at 26]:

19          I find the medical opinions of Dr. Sri are conclusory, with little or nothing in the way
            of objective support or rationale for the extreme limitations it imposes.  I find the
20          opinion of Dr. Sri is not well supported by the objective medical evidence or the
            evidence present in the record as a whole, as outlined above.  I note the second
21          opinion of Dr. Sri expressly relies on [plaintiff]'s subjective complaints and pain
            behaviors, rather than any significant clinical abnormalities in support of the
22          limitations it imposes and is also directly contradicted by [plaintiff]'s own statements
            [of] record and [plaintiff]'s testimony at the hearing, where he acknowledged that he
23          was able to walk up to half a mile at one time.  I conclude that Dr. Sri was basing his
            opinion largely on [plaintiff]'s subjective complaints, which, as outlined above, are
24          not entirely credible.

25   [Id.]

26

27   _____

28      [5]   The form does not indicate whether this is per week, per month, or some other measure of time.

1    Dr. Villanueva treated plaintiff for pain management for "2 yrs 1 month." [AR at 918.]  The

2    record contains progress notes from Universal Pain Management from December 2010 through

3    April 2012.[6]  [AR at 669-715.]  The progress notes document plaintiff's complaints of back pain.

4    [Id.]  Findings include tender lumbar area in the paraspinous muscles bilaterally, and periodic

5    mildly antalgic gait and mild difficulty getting on and off of the examination table.  [AR at 670, 673,

6    678, 681.]  Plaintiff was assessed as having chronic low back pain and chronic knee pain, doing

7    "pretty well" on his medication, and remaining a candidate for repeat facet injections.  [AR at 670.]

8    On May 2, 2013, Dr. Villanueva completed a Medical Source Statement of Ability to do

9    Work Related Activities (PHYSICAL) form.  [AR at 918-20.]  In that form, Dr. Villanueva opined

10   that plaintiff could walk three city blocks without rest or severe pain; could sit for twenty minutes

11   at one time, stand for fifteen minutes at one time, and sit and stand/walk for twenty minutes total

12   in an eight-hour day; must shift at will from sitting, standing or walking; would need unscheduled

13   breaks every twenty minutes for twenty minutes during a workday; could occasionally lift and carry

14   ten pounds; could rarely carry twenty pounds; could occasionally twist, climb stairs, or balance;

15   could rarely stoop (bend), crouch/squat, or kneel; could never climb ladders; could occasionally

16   handle and finger; could rarely reach; would be "off task" twenty-five percent or more of a typical

17   workday; would be absent from work more than three days due to his impairments or treatment;

18   and would need to avoid extreme temperatures and vibration.  [Id.]  Dr. Villanueva identified the

19   following as plaintiff's symptoms:  pain in back and both legs, insomnia, fatigue, and loss of

20   interest.  [AR at 918.]  Dr. Villanueva described plaintiff's treatment and response, including

21   medication side effects, as "[d]rowsiness, dizzyness [sic][,] ability to drive a car."  [Id.]

22   The ALJ gave "little weight" to Dr. Villanueva's opinion that plaintiff would be incapable of

23   performing even a substantial range of sedentary work.  [AR at 25.]  The ALJ stated as follows:

24

25

_____

26   [6]   The records do not specifically associate Dr. Villanueva with Universal Pain Management, but
     the address associated with Dr. Villanueva is the same as the address of Universal Pain Management.
27   [See, e.g., AR at 669, 920.]  Both Dr. Villanueva and the Universal Pain Management physicians
     participated in plaintiff's pain management.  Accordingly, the Court considered the Universal Pain
28   Management treatment records when considering Dr. Villanueva's treatment of plaintiff.

1    The only explanation or rationale provided was that [plaintiff] reported symptoms, including pain in the back and both legs, insomnia, fatigue, and loss of interest, and
2    that [plaintiff] reported side-effects from prescribed medications, including drowsiness, dizziness, and inability to drive a car. No objective explanation or
3    rationale was provided. I find the medical opinion of [plaintiff]'s treating physician Dr. Villanueva is conclusory, with nothing in the way of objective explanation or
4    rationale for its extreme limitations. Also, it is not well supported by the objective medical evidence outlined above and inconsistent with the doctor's own treatment
5    notes.

6    [Id. (citation omitted).]

7    Regarding plaintiff's physical limitations, the ALJ gave "substantial weight" to the opinion

8    of P.A. Talcherkar, M.D., a non-examining state agency medical consultant who opined that

9    plaintiff would be capable of performing a wide range of light exertional work. [AR at 25, 648-53.]

10

11        a.    Lack of Objective Findings

12    The ALJ's finding that the opinions of Dr. Sri and Dr. Villanueva are "conclusory" and lack

13    objective findings to support their "extreme limitations" is not supported by substantial evidence.

14    [AR at 25-26.] Dr. Sri and Dr. Villanueva completed standardized forms, referencing plaintiff's

15    symptoms and treatment. [AR at 914, 918.] Dr. Sri identified clinical findings and signs, and Dr.

16    Villanueva left that portion blank. [Id.] The Court notes, however, that although the supporting

17    evidence listed on the forms is minimal, the treatment records of Dr. Sri and the pain management

18    physicians generally support their opinions. See Kager v. Astrue, 256 Fed. App'x 919, 921 (9th

19    Cir. 2007) ("While it is true that the notes setting forth [the treating physician]'s opinion did not

20    themselves refer to specific limitations or clinical findings, [the treating physician]'s other treatment

21    notes did contain objective findings supporting her opinion that [plaintiff] was unable to perform

22    past relevant work.")

23    Dr. Sri's treatment records contain repeated diagnoses of degenerative disc disease of the

24    lumbar spine with protrusion of L4-L5 with nerve impingement and depression, among other

25    diagnoses such as sciatica and anxiety. [AR at 718-19, 826-28, 908-09.] Similarly, the Universal

26    Pain Management treatment records show plaintiff's ongoing treatment for chronic low back pain

27    and chronic knee pain; findings of difficulty with mobility, antalgic gait, decreased extension and

28    flexion of the low back, and periodic positive straight leg raising test results; treatment with opioids

and recommended facet injections and physical therapy; and evidence of peripheral neuropathy of the bilateral lower extremities, worse on the right.  [AR at 669-711.]  The ALJ does not identify how the diagnoses and findings of Dr. Sri and Dr. Villanueva, and the findings underlying those diagnoses, fail to support their opinions.  See McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989) (finding that rejecting the treating physician's opinion on the ground that it was contrary to clinical findings in the record was "broad and vague, failing to specify why the ALJ felt the treating physician's opinion was flawed").  Thus, the ALJ's reliance on the lack of supporting objective findings does not reach the level of specificity required to reject the opinion of a treating physician. See Embrey v. Bowen, 849 F.2d 418, 421-23 (9th Cir. 1988) ("To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required, even when the objective factors are listed seriatim.  The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the [treating] doctors', are correct.") (footnote omitted).

Accordingly, this was not a specific and legitimate reason supported by substantial evidence for discounting the opinions of Dr. Sri and Dr. Villanueva.

### b.    Objective Medical Evidence

The ALJ discounted the opinions of Dr. Sri and Dr. Villanueva because they were not supported by the objective medical evidence or the record as a whole.  The Court notes that both Dr. Sri and Dr. Villanueva opined that plaintiff would be incapable of performing even a substantial range of sedentary work.  [AR at 914-16, 918-20.]  Also, the record indicates that plaintiff had degenerative changes of the lumbar spine with paraspinal tenderness exacerbated by prolonged activity or sitting or standing in any position for prolonged periods; had a lumbar facet block at L3-S1, and was a candidate for repeated facet injections; had diminished straight leg raising bilaterally, right more than left; had, at times, a mildly antalgic gait and difficulty getting on and off of the examination table; had clinical and diagnostic abnormalities indicating the presence of lower extremity neuropathy; and had multiple left knee surgeries and injections.  [See, e.g., AR at 327-

30, 355, 358, 360, 405, 502, 563, 566, 568, 608, 614, 617, 619, 670, 678, 711.]  While the ALJ acknowledged some of this objective medical evidence [AR at 25], he concluded, without explanation, that the evidence supported Dr. Talcherkar's opinion that plaintiff was capable of a wide range of light work, and not the opinions of Dr. Sri and Dr. Villanueva.  [AR at 25-26.]  The opinion of a non-examining physician may only serve as a basis to reject the opinion of a treating physician where the non-examining physician's opinion is consistent with other independent evidence in the record.  See Ryan, 528 F.3d at 1202 ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.") (internal citation and quotations omitted).  Here, Dr. Talcherkar's opinion was rendered in March 2011, over two years before the hearing and well before the opinions of Dr. Sri and Dr. Villanueva.  [AR at 25-26.]  Because of the date of Dr. Talcherkar's opinion, Dr. Talcherkar did not have the benefit of considering evidence such as imaging results that showed degenerative changes of the lumbar spine, or the fact that plaintiff had undergone a lumbar facet block at L3-S1, and was a candidate for repeated facet injections.  [AR at 608, 617, 619, 670, 673.]  Because Dr. Talcherkar's opinion was not consistent with other independent evidence in the record, it was error for the ALJ to give it "substantial weight" over the opinions of Dr. Sri and Dr. Villanueva.

Accordingly, the ALJ did not provide specific and legitimate reasons supported by substantial evidence for discounting the opinions of Dr. Sri and Dr. Villanueva based on lack of support by the objective medical evidence or in the record as a whole.  See Orn, 495 F.3d at 632-33; see also Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) ("The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record.") (internal citation omitted).

### c.    Reliance on Subjective Complaints

The ALJ noted that Dr. Sri's April 2013 opinion was based "largely" on plaintiff's subjective complaints.  [AR at 26.]  However, as discussed infra Part V.B., the ALJ erred by discounting

plaintiff's credibility, and furthermore, an ALJ does not provide a legitimate reason to reject the opinion of a treating physician "by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations."  See Ryan, 528 F.3d at 1199-1200 (citing Edlund v. Massanari, 253 F.3d 1152, 1159 (9th Cir. 2001)).  Here, in addition to plaintiff's complaints, Dr. Sri's opinion was based on his examinations of plaintiff; his knowledge of plaintiff's panic attacks, chest pain, chronic back problems, and left knee replacement; plaintiff's concurrent treatment for pain management and mental health; and plaintiff's treatment with medication, including narcotic pain relievers such as Oxycontin and Vicodin. [AR at 718-19, 826-28, 908-09.] The opinions of treating physicians are generally given more weight than the opinions of other physicians because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see id. at §§ 404.1527(c)(2) (i), (ii), 416.927(c)(2)(i), (ii) (weight accorded to a treating physician's opinion dependent on length of the treatment relationship, frequency of visits, and nature and extent of treatment received).  Based on the length of Dr. Sri's treatment relationship and his experience with plaintiff, Dr. Sri had a broad range of knowledge regarding plaintiff's condition, which is supported by the treatment records.  See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Lester, 81 F.3d at 833 ("The treating physician's continuing relationship with the claimant makes him especially qualified to evaluate reports from examining doctors, to integrate the medical information they provide, and to form an overall conclusion as to functional capacities and limitations, as well as to prescribe or approve the overall course of treatment.").  As in Ryan, 528 F.3d 1194, "[t]here is nothing in the record [here] to suggest that [Dr. Sri] disbelieved [plaintiff's] description of [his] symptoms, or that [Dr. Sri] relied on those descriptions more heavily than his own clinical observations in reaching the conclusion that [plaintiff is] incapable of maintaining a regular work schedule."  See Ryan, 528 F.3d at 1200 (citation omitted).

1    Accordingly, this was not a specific and legitimate reason supported by substantial

2    evidence for discounting Dr. Sri's opinion.

3

4         **d.    Conclusion**

5    Based on the foregoing, the ALJ did not provide specific and legitimate reasons supported

6    by substantial evidence for giving "little weight" to the opinions of Dr. Sri and Dr. Villanueva.

7    Remand is warranted on this issue.

8

9         **3.    Dr. Archambeault**

10   Dr. Archambeault, or other mental health providers, treated plaintiff at Palmdale Mental

11   Health Center since July 2012.  [AR at 732-50, 848-67.]  In the initial assessment, the licensed

12   clinical social worker indicated that plaintiff was referred to Palmdale Mental Health Center due

13   to depression and panic attacks.  [AR at 735.]  Plaintiff was diagnosed with mood disorder, not

14   otherwise specified, and polysubstance dependence, and was assigned a global assessment of

15   functioning ("GAF")[7] score of 60.[8]  [AR at 737.]  In the initial medical evaluation by Dr. Eslao[9] on

16   August 7, 2012, plaintiff was diagnosed with panic disorder with agoraphobia, bipolar disorder, not

17   otherwise specified, and alcohol dependence, in full sustained remission, and was assigned a

18

19   ─────────────

20   [7]   A GAF score is the clinician's judgment of the individual's overall level of functioning.  It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments

21   in functioning due to physical or environmental limitations.  Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000) ("DSM-IV").  The most recent edition of the DSM "dropped" the GAF scale,

22   citing its "conceptual lack of clarity" and "questionable psychometrics in routine practice."  Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2012).

23

24   [8]   A GAF score in the range of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers).  DSM-

25   IV 34.

26   [9]   Although the signature is illegible, the Court surmises the signature belongs to Dr. Eslao because the progress notes of the licensed case social worker indicate that plaintiff was treated by Dr.

27   Eslao, and the license number [AR at 862] belongs to a Dr. Omar Anthony Valencia Eslao, M.D.  [See, e.g., AR at 849, 851]; http://www.hipaaspace.com/Medical_Billing/Coding (last visited on Apr. 13,

28   2015).

1   GAF score of 50-55.[10]  [AR at 749-51.]  Plaintiff started taking Abilify as a mood stabilizer.  [Id.]

2          On May 3, 2013, Dr. Archambeault completed a Medical Source Statement of Ability to do

3   Work Related Activities (MENTAL) form and provided an accompanying confirmation of mental

4   health treatment.  [AR at 922-25.]  Dr. Archambeault indicated that plaintiff had been treated at

5   Palmdale Mental Health Center on a monthly basis since July 8, 2012.  [AR at 925.]   Dr.

6   Archambeault stated that plaintiff's current diagnosis is panic disorder with agoraphobia and

7   bipolar disorder, not otherwise specified, and plaintiff "has a history of psychiatric hospitalization."

8   [Id.]  Dr. Archambeault opined that plaintiff's performance is precluded for ten percent of an eight-

9   hour workday in the areas of understanding, remembering and carrying out detailed instructions;

10  sustaining an ordinary routine without special supervision; making simple work related decisions;

11  completing a normal workday and workweek without interruptions from psychologically-based

12  symptoms and performing at a consistent pace without an unreasonable number and length of rest

13  periods; accepting instructions and responding appropriately to criticism from supervisors; getting

14  along with coworkers or peers without distracting them or exhibiting behavioral extremes;

15  responding appropriately to changes in a work setting; being aware of normal hazards and taking

16  appropriate precautions; and experiencing restrictions of daily living. [AR at 922-23.]  She opined

17  that plaintiff's performance is precluded for more than fifteen percent of an eight-hour workday in

18  the areas of maintaining attention and concentration for extended periods of time; performing

19  activities within a schedule, maintaining regular attendance, and being punctual and within

20  customary tolerances; working in coordination with or in proximity to others without being

21  distracted by them; traveling to unfamiliar places or using public transportation; setting realistic

22  goals or making plans independently of others; experiencing difficulties in maintaining social

23  functioning; and experiencing difficulties in maintaining concentration, persistence and pace. [Id.]

24  She opined that plaintiff would be absent from work more than three days due to plaintiff's

25

26  _____

27      [10]   A GAF score in the range of 41-50 indicates serious symptoms (e.g., suicidal ideation,
    obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school
28  functioning (e.g., no friends, unable to keep a job).  DSM-IV 34.

1    impairments or treatment,[11] and would be "off task" for thirty percent or more of an eight-hour

2    workday.  [AR at 924.]

3         The ALJ gave "little weight" to Dr. Archambeault's opinion that plaintiff would be incapable

4    of meeting the basic mental demands of work.  [AR at 26-27.]  The ALJ stated as follows:

5         Dr. Archambeault provided no explanation or rationale for the extreme limitations
          she prescribed.  I find the opinion of Dr. Archambeault is also conclusory, with
6         nothing in the way of explanation or rationale for the extreme limitations it poses.
          I further find the opinion of Dr. Archambeault is not well supported by the objective
7         medical evidence outlined above and is based largely on [plaintiff]'s subjective
          statements and complaints.  It is also less well supported by the objective medical
8         evidence outlined above than the opinions of examining psychiatrist Dr. Lee and of
          the state agency medical consultants.  Finally, the opinion of Dr. Archambeault is
9         also contradicted by [plaintiff]'s acknowledged significant daily activities, [plaintiff]'s
          own statements concerning his functional level contained in the record, and
10        [plaintiff]'s testimony at the hearing, where the only significant mental symptom or
          limitation he described was a tendency to have panic attacks when operating a
11        motor vehicle.

12   [Id.]  The ALJ gave "substantial weight" to the opinion of Dr. Lee, a consultative psychiatric

13   examiner who evaluated plaintiff on August 11, 2012.  [AR at 25, 755-60.]  Dr. Lee found that

14   plaintiff's psychiatric problems were mild to moderate, and opined that plaintiff had no functional

15   limitations in the ability to perform work "if he continue[d] with his current psychiatric treatment."

16   [AR at 759-60.]

17

18              a.    **Lack of Objective Findings**

19        The ALJ's finding that Dr. Archambeault's opinion is "conclusory" and lacks objective

20   findings to support her "extreme limitations" is not supported by substantial evidence.  [AR at 26.]

21   Dr. Archambeault completed a standardized form that did not request supporting findings, and she

22   provided none.  [AR at 924.]  The Court notes, however, that although the supporting evidence

23   listed on the forms is nonexistent, the Palmdale Mental Health Center treatment records generally

24   support Dr. Archambeault's opinions.  See Kager, 256 Fed. App'x at 921.

25        The Palmdale Mental Health Center treatment records contain repeated diagnoses and

26

27   ────────────────────

28        [11]  The form does not indicate whether this is per week, per month, or some other measure of
     time.

1  assessments of panic disorder with agoraphobia and mood disorder, not otherwise specified. [AR

2  at 737, 750, 862, 864, 867.]  The treatment records indicate that plaintiff had a "bad panic attack"

3  in October 2012, possibly due to an increase in Abilify, that required him to go to the emergency

4  room.  [AR at 865.]  Plaintiff's mood was "better" in November 2012, and plaintiff was able to work

5  as an electrician for three weeks until he got hurt on the job.  [AR at 852-53, 862, 864.]  On

6  December 20, 2012, plaintiff reported struggling with depression, crying spells, "a lot of anxiety,"

7  and suicidal ideations.  [AR at 851.]  A mental status examination on the same date showed that

8  plaintiff was cooperative, with normal speech, appropriate affect, and coherent thought processes.

9  [AR at 862.]  Dr. Eslao's initial assessment indicated that "we cannot completely rule out the

10  presence of Bipolar [disorder]." [Id.] On February 6, 2013, plaintiff indicated that he was "severely

11  depressed," had sleep problems and intermittent suicidal thoughts, and was admitted to the mental

12  health unit at the hospital.  [AR at 849, 860.]  On February 13, 2013, plaintiff reported that the

13  hospital had given him Triavil, which helped prevent his suicidal thoughts.  [AR at 859.]  Dr. Eslao

14  noted some irritability and a depressed mood [id.], although plaintiff reported to the licensed

15  clinical social worker that he was "dealing" with things better, had gotten engaged to his

16  girlfriend,[12] and had moved into her apartment.  [AR at 848.]

17       The ALJ does not identify how the diagnoses of plaintiff's mental health providers, and the

18  findings underlying those diagnoses, fail to support Dr. Archambeault's opinion.  See McAllister,

19  888 F.2d at 602.  The ALJ acknowledged the treatment notes from Palmdale Mental Health

20  Center, but found that the treatment notes "document [plaintiff]'s good response to prescribed

21  treatment and medications" and indicate that plaintiff was "doing well" and working in November

22  2012.  [AR at 24-25.]  The ALJ also noted, confusingly, that plaintiff's "examination or only

23  minimally abnormal for occasional irritability but with [plaintiff]'s speech, thought process, thought

24  content normal and his affect consistently congruent to his mood."  [AR at 25.]  Nevertheless, the

25  ALJ did not mention plaintiff's trip to the emergency room for a panic attack in October 2012 or his

26

27  _____

28  [12]   The Court notes that at the hearing in June 2013, plaintiff referred to his "ex-girlfriend."  [AR at 47.]

1  hospitalization for severe depression and suicidal thoughts in February 2013. [AR at 24-25.] The

2  ALJ also left out the fact that plaintiff was able to work for only three weeks. [AR at 852-53, 862,

3  864.] An ALJ must consider all of the relevant evidence in the record and may not point to only

4  those portions of the records that bolster his findings. See, e.g., Holohan v. Massanari, 246 F.3d

5  1195, 1207-08 (holding that an ALJ cannot selectively rely on some entries in plaintiff's records

6  while ignoring others); Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) ("[T]he [ALJ]'s

7  decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'")

8  (citing Sousa v. Callahan, 143 F.3d 1240, 1243 (9th Cir. 1998)); see also Reddick, 157 F.3d at

9  722-23 (it is impermissible for the ALJ to develop an evidentiary basis by "not fully accounting for

10  the context of materials or all parts of the testimony and reports"); Robinson v. Barnhart, 366 F.3d

11  1078, 1083 (10th Cir. 2004) ("The ALJ is not entitled to pick and choose from a medical opinion,

12  using only those parts that are favorable to a finding of nondisability."); Whitney v. Schweiker, 695

13  F.2d 784, 788 (7th Cir. 1982) ("[A]n ALJ must weigh all the evidence and may not ignore evidence

14  that suggests an opposite conclusion.") (citation omitted).

15      Accordingly, this was not a specific and legitimate reason supported by substantial

16  evidence for discounting Dr. Archambeault's opinion.

18      **b.    Lack of Objective Evidence**

19      The ALJ discounted Dr. Archambeault's opinion because it was not supported by the

20  objective medical evidence. Antelope Valley Hospital records corroborate plaintiff's report that he

21  was hospitalized for three days in February 2013 for major depression and suicidal thoughts. [AR

22  at 879-95.] Plaintiff's GAF score at the time of admission was 28.[13] [AR at 894.] In March 2013,

23  plaintiff went to the Antelope Valley Hospital emergency room with complaints of anxiety and

24  "feeling like crawling out of skin." [AR at 869-78.] The clinical impression listed on the Emergency

25  Physician Record indicates depression and anxiety. [AR at 871.] A nursing assessment indicates

27  [13]  A GAF score in the range of 21-30 indicates serious impairment in communication or judgment
28  or an inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). DSM-IV 34.

18

that plaintiff was anxious and his affect and behavior were inappropriate. [AR at 874.]  Plaintiff was treated with medication and was "stable" at discharge the same day.  [AR at 875.]  Palmdale Regional Medical Center records corroborate plaintiff's report that he went to the emergency room for a panic attack in October 2012.  [AR at 785-89.]  A psychiatric examination revealed that plaintiff had an anxious mood and affect.  [AR at 787.]  Plaintiff's differential diagnosis was "[a]nxiety."  [AR at 787.]  Plaintiff was treated with medication at Palmdale Regional Medical Center and was discharged on the same day, once his symptoms resolved.  [AR at 788-89.]

The ALJ noted that the objective medical evidence showed that plaintiff had an "entirely normal" mental status examination during the psychiatric consultative examination conducted by Dr. Lee on August 11, 2012.  [AR at 25.]  However, Dr. Lee also diagnosed plaintiff with mood disorder, not otherwise specified, and found that plaintiff's psychiatric symptoms were mild to moderate.  [AR at 759.]  Further, at the time Dr. Lee evaluated plaintiff, plaintiff had only one prior psychiatric hospitalization in September 2003.  [AR at 757.]  Thus, Dr. Lee did not have the benefit of the records relating to plaintiff's subsequent visit to the emergency room for a panic attack in October 2012, or plaintiff's admission to the hospital for three days for major depression and suicidal thoughts in February 2013.

In light of the record as a whole, the Court finds that there is objective evidence in the record that may support Dr. Archambeault's opinion that was not discussed by the ALJ or considered by Dr. Lee.  Accordingly, the lack of supporting objective medical evidence was not a specific and legitimate reason supported by substantial evidence for discounting Dr. Archambeault's opinion.  See Orn, 495 F.3d at 632-33.

Moreover, to the extent the ALJ discounted Dr. Archambeault's opinion because it was "less well supported by the objective medical evidence outlined above than the opinions of examining psychiatrist Dr. Lee and of the state agency medical consultants" [AR at 26], the ALJ erred.  As discussed, Dr. Lee did not consider plaintiff's panic attack in October 2012 or plaintiff's admission to the hospital in February 2013.  While Sidney Gold, M.D., a non-examining state agency psychiatrist, considered the October 2012 panic attack, he did not consider plaintiff's admission to the hospital shortly after that in February 2013.  [AR at 92.]  Accordingly, the Court cannot

19

1 conclude that Dr. Archambeault's opinion was less well supported by the objective medical

2 evidence than Dr. Lee's and Dr. Gold's opinions.  Therefore, this was not a specific and legitimate

3 reason supported by substantial evidence for discounting Dr. Archambeault's opinion.

4

5       **c.**  **Reliance on Subjective Complaints**

6    The ALJ noted that Dr. Archambeault's opinion was based "largely" on plaintiff's subjective

7 complaints.  [AR at 26.]  However, the Palmdale Mental Health Center progress notes reflect

8 mental status examinations, treatment provider observations of plaintiff independent from his

9 subjective complaints, and regular monitoring of plaintiff's medication regimen.  [AR at 737, 748,

10 859, 861-62, 864-65, 867.]  Thus, for the same reasons discussed relating to the opinion of Dr.

11 Sri, this was not a specific and legitimate reason supported by substantial evidence for discounting

12 Dr. Archambeault's opinion.  See Ryan, 528 F.3d at 1199-1200.

13

14       **d.**  **Plaintiff's Activities of Daily Living, Statements, and Testimony**

15    The ALJ found that Dr. Archambeault's opinion was contradicted by plaintiff's "significant"

16 activities of daily living, plaintiff's statements concerning his functional level, and plaintiff's

17 testimony at the hearing, "where the only significant mental symptom or limitation he described

18 was a tendency to have panic attacks when operating a motor vehicle."  [AR at 26-27.]

19    The ALJ generally described plaintiff's daily activities as including "self-care and grooming,

20 preparing meals, performing household chores, performing yard work, going out daily, going to

21 church, riding in cars, shopping for groceries and clothes, managing personal finances, and

22 spending time with others socially multiple times each week."  [AR at 19; see also AR at 274-81,

23 758.] The ALJ characterized these daily activities as "significant."  [AR at 19.] The ALJ also noted

24 that plaintiff "regularly spend[s] time [socializing] with others at church, play[s] cards, play[s]

25 Scrabble, and watch[es] T.V.," which he typically does a couple of times per week.  [AR at 19

26 (citing AR at 270).]

27    While an inconsistency between a treating physician's opinion and a claimant's daily

28 activities may be a specific and legitimate reason to discount a treating physician's opinion, this

1   is not true when a "holistic review of the record does not reveal an inconsistency between the
2   treating providers' opinions and [the claimant's] daily activities." Ghanim, 763 F.3d at 1162. Here,
3   a review of the record fails to show how these daily activities are inconsistent with Dr.
4   Archambeault's opinion of plaintiff's mental ability to do work related activities. For example,
5   plaintiff testified that he no longer drives because he had a "really bad panic attack" on the freeway
6   [AR at 48], he sometimes has a panic attack as a passenger in a car [AR at 41], he would
7   "[p]robably not" get along with his supervisors because he gets upset and is "usually depressed"
8   [AR at 49], his "short-term memory has gone" [AR at 41], his medications make him "a little bit
9   unstable" [AR at 45], and he "can't do anything for more than 20 minutes." [Id.][14] Further, it
10  appears that many of the cited activities do not occur daily, and none appears to be of extended
11  duration.

12          The ALJ also provided no explanation as to how plaintiff's activities are inconsistent with
13  Dr. Archambeault's opinion regarding plaintiff's limitations in understanding and memory,
14  sustained concentration and memory, social interaction, adaptation, social functioning, and
15  concentration, persistence and pace. [AR at 922-23.] Moreover, in light of plaintiff's mental health
16  treatment records as a whole, the Court is unable to conclude that plaintiff's activities, statements
17  concerning his functional level, and testimony at the hearing regarding his mental health
18  impairment constitute substantial evidence sufficient to discount Dr. Archambeault's opinion.

19          Accordingly, this was not a specific and legitimate reason supported by substantial
20  evidence for discounting Dr. Archambeault's opinion.

21

22                  e.      Conclusion

23          Based on the foregoing, the ALJ did not provide specific and legitimate reasons supported
24  by substantial evidence for giving Dr. Archambeault's opinion "little weight." Remand is warranted
25  on this issue.

26  _____

27      [14]     Thus, the ALJ's finding that plaintiff did not testify about the difficulties that he experienced as
    a result of his mental health impairment, other than driving a car, misstated the evidence. [AR at 26-
28  27.]

**B.   CREDIBILITY**

Plaintiff contends the ALJ failed to articulate legally sufficient reasons for rejecting plaintiff's subjective symptom testimony.  [JS at 24-31, 36-37.]  The Court agrees.

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis."  Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  Id. at 1036 (quoting Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  Second, if the claimant meets the first test, the ALJ may reject the claimant's testimony about the severity of his symptoms "only upon (1) finding evidence of malingering, or (2) expressing clear and convincing reasons for doing so."  Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003).  Factors to be considered in weighing a claimant's credibility include:  (1) the claimant's reputation for truthfulness; (2) inconsistencies either in the claimant's testimony or between the claimant's testimony and his conduct; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); see also Ghanim, 763 F.3d at 1163; 20 C.F.R. §§ 404.1529(c), 416.929(c).

Where, as here, plaintiff has presented evidence of an underlying impairment, and the ALJ did not find "affirmative evidence" of malingering [see, generally, AR at 21-22], the ALJ's reasons for rejecting a claimant's credibility must be specific, clear and convincing.  Burrell v. Colvin, 775 F.3d 1133, 1140 (9th Cir. 2014) (citing Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012)).  "General findings [regarding a claimant's credibility] are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  Id. at 1138 (quoting Lester, 81 F.3d at 834) (internal quotation marks omitted).  The ALJ's findings "must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain."  Bunnell, 947 F.2d at 345-46 (citation and internal quotation marks omitted).  A "reviewing

court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain." Id. at 346. As such, an "implicit" finding that a plaintiff's testimony is not credible is insufficient. Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (per curiam).

As noted by the ALJ [AR at 21], plaintiff testified that on his best day, he can do small chores around the house in twenty-minute intervals because "that's all my back will take," and then he needs to lie down for thirty to forty-five minutes before he can continue with his tasks [AR at 41-42]; if he sits with a back brace, he can sit "close to an hour," but he will be "really sore" [AR at 43]; he can stand for fifteen or twenty minutes, and then needs to lie down for about an hour [AR at 45-46]; he can walk about a half-mile [AR at 46]; he can lift about ten pounds [AR at 47]; he can sit for a total of four out of eight hours [AR 50-51]; he can stand and walk for a total of one out of eight hours [AR at 51]; he does not drive anymore because he has panic attacks when he drives, and he sometimes has panic attacks when he is a passenger [AR at 41]; and his short-term memory "has gone" on him [id.]

Finding plaintiff's subjective complaints to be "not entirely credible," the ALJ concluded that plaintiff had presented medically determinable impairments that could reasonably be expected to cause the alleged symptoms, but that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." [AR at 21.] The ALJ stated the following reasons for this determination: (1) plaintiff acknowledged "significant daily activities" that are inconsistent with the alleged degree of impairment; (2) plaintiff's statements to his physicians are inconsistent with the alleged degree of impairment; (3) the medical opinions of Dr. Lee and the state agency medical consultants are "well supported;" (4) the objective medical evidence does not support plaintiff's allegations; (5) plaintiff's treatment regimen was "generally conservative;" (6) the observations of administration personnel do not support plaintiff's allegations; (7) plaintiff reportedly received unemployment benefits between approximately February 2011 and February 2012; (8) plaintiff had a "somewhat inconsistent work history and earnings record" before the alleged onset date; and (9) plaintiff demonstrated "sufficient attention and concentration" at the hearing. [AR at 22.]

1    Having carefully reviewed the record, the Court concludes that the ALJ's credibility

2    determination is not supported by substantial evidence.

3

4    **1.    Plaintiff's Daily Activities**

5    The ALJ found that plaintiff's "significant daily activities" were "fundamentally inconsistent

6    with complaints of disabling pain or psychiatric symptoms." [AR at 22.]  The ALJ noted that

7    plaintiff could perform self-care and grooming, prepare meals, perform household chores, perform

8    yard work, go out daily, go to church, ride in cars, shop for groceries and clothes, manage

9    personal finances, and spend time with others socially, multiple times each week. [AR at 19.] A

10   claimant does not have to be completely incapacitated to be disabled.  See Fair v. Bowen, 885

11   F.2d 597, 603 (9th Cir. 1989); see also Vertigan v. Halter, 260 F.3d 1044, 1049-50 (9th Cir. 2001)

12   ("the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping,

13   driving a car, or limited walking or exercise, does not in any way detract from her credibility as to

14   her overall disability."); Gallant v. Heckler, 753 F.2d 1453-55, 1456 (9th Cir. 1984) (fact that

15   claimant could cook for himself and family members as well as wash dishes did not preclude a

16   finding that claimant was disabled).  Further, plaintiff testified to a limited amount of activity: while

17   he can do small chores around the house, he is limited to only twenty-minute intervals, and then

18   he must rest for thirty to forty-five minutes [AR at 41-42]; he does not drive anymore due to panic

19   attacks [AR at 41]; he usually has one good day and one bad day each week, and on a bad day,

20   he "really do[es]n't get out of bed" [id.]; and he spends time socializing with others only a couple

21   of times a week. [AR at 270.] Neither has the ALJ shown that plaintiff's activities "are transferable

22   to basic work activity."  See Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990) (holding

23   that daily activities may not be relied upon to support an adverse credibility determination unless

24   the ALJ makes an explicit finding that plaintiff's ability to perform those activities translated into

25   the ability to perform appropriate work activities on an ongoing and daily basis).  Accordingly, this

26   was not a specific, clear and convincing reason to discount plaintiff's subjective statements.

27   **2.    Statements Inconsistent with Allegations**

28   The ALJ discounted plaintiff's credibility due to "the lack of consistency between [plaintiff]'s

24

1    statements to his physicians and contained in the medical record and the degree of symptoms and
2    limitations he generally alleges and testified to during the hearing." [AR at 22.] The ALJ did not
3    identify which of plaintiff's statements he found inconsistent with the allegations. See Burrell, 775
4    F.3d at 1138. To the extent that the ALJ found plaintiff's statements that he was going to college
5    and was "working out a lot" inconsistent with plaintiff's allegations of disabling back pain, the
6    finding is misguided. [AR at 23-24.] Plaintiff's statement that he continued going to school was
7    made in March 2011, prior to the alleged onset date. [AR at 701.] Regarding the statement about
8    working out, the Court agrees with plaintiff's argument that the statement is "completely
9    ambiguous as to time frame." [JS at 36.] The "subjective" component of Dr. Sri's May 30, 2012,
10   treatment record[15] reflects the following: "Pt has had [history] of panic attacks[.] Pt worked-out
11   a lot and this helped but has had more frequent attacks." [AR at 719.] Even if plaintiff was not
12   talking about the past, the statement does not necessarily contradict plaintiff's testimony that he
13   could go out in the yard and get some exercise. [AR at 42.] Accordingly, this was not a specific,
14   clear and convincing reason to discount plaintiff's subjective statements.

15

16        **3.    Opinions of Examining and Non-Examining Physicians**

17        The ALJ discounted plaintiff's credibility based on "the contravening and well supported
18   medical opinions of the state agency medical consultants and examining psychiatrist Dr. Lee."
19   [AR at 22.] As discussed, state agency medical consultant Dr. Talcherkar opined that plaintiff
20   would be capable of performing a wide range of light exertional work. [AR at 649-53.] Dr. Lee
21   opined that plaintiff had no significant limitation in his ability to perform the mental demands of
22   work. [AR at 760.] State agency psychiatrist Dr. Gold opined that plaintiff would be limited to
23   performing work involving no more than simple and repetitive tasks, with limited public contact.
24   [AR at 97-98.]

25        Statements from physicians concerning the nature, severity, and effects of the symptoms
26   of which a claimant complains are among the factors to be considered in weighing a claimant's

27   _____

28        [15]   The ALJ referred to the date of the treatment note as March 30, 2012. [AR at 24.]

1    credibility.  See Thomas, 278 F.3d at 958-59; Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th

2    Cir. 1997); see also 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  Nevertheless, the ALJ must

3    consider all of the relevant evidence in the record and may not point to only those portions of the

4    records that bolster his findings.  See Reddick, 157 F.3d at 722-23 (It is impermissible for the ALJ

5    to develop an evidentiary basis by "not fully accounting for the context of materials or all parts of

6    the testimony and reports."); Gallant, 753 F.2d at 1456 (error for an ALJ to ignore competent

7    evidence in the record in order to justify her conclusion).  Here, the ALJ relied on the opinions of

8    Dr. Talcherkar, Dr. Lee, and Dr. Gold to discredit plaintiff, but failed to provide adequate reasons

9    to reject the treating physicians' opinions in favor of the other physicians' opinions.  [See supra,

10   Part V.A.]  Accordingly, this was not a specific, clear and convincing reason to discount plaintiff's

11   subjective statements.

12

13            **4.    Objective Evidence of Record**

14            While a lack of objective medical evidence supporting a plaintiff's subjective complaints is

15   one factor that an ALJ can consider in evaluating symptom testimony, it cannot provide the only

16   basis to reject a claimant's credibility.  See Light, 119 F.3d at 792; Burch v. Barnhart, 400 F.3d

17   676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for

18   discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis.");

19   accord Rollins, 261 F.3d at 857.

20            Here, the ALJ noted the "absence of abnormal clinical signs and diagnostic findings"

21   consistent with plaintiff's alleged symptoms, and the "presence of only minor abnormalities" shown

22   in diagnostic imaging of the lumbar spine.  [AR at 22.]

23            Plaintiff argues that "the medical record fully supports [his] testimony regarding pain and

24   functional limitations."  [JS at 26.]  Plaintiff cites to the following evidence [JS at 26-27]:  his

25   January 2009 left knee surgery [AR at 428]; an April 2009 MRI of the left knee showing

26   "progressive increase in chondral damage particularly evident along the weight bearing aspect of

27   the medial femoral condyle" [AR at 426]; a September 2010 bone scan study showing

28   "asymmetrically increased blood flow and blood pooling activity along with areas of increased

26

activity in the left knee joint on the delayed images" [AR at 518]; a December 2010 abnormal EMG study indicating evidence of peripheral neuropathy of the bilateral lower extremities (worse on the right) of a mixed axonal and demyelinating type affecting the motor and sensory nerves [AR at 711]; a February 2011 CT of the lumbar spine showing disc disease at L4-L5 with compression and mild narrowing at multiple levels [AR at 619]; treatment with narcotic medication [AR at 670, 675, 678]; a March 2011 bilateral facet block at L3-L4, L4-L5, and L5-S1 [AR at 608]; recommendations for additional facet block injections [AR at 675]; treatment since July 2012 for major depression [AR at 735-37]; and admission to the hospital for suicidal ideations [AR at 851, 879-95.]   In addition, the Court finds that the diagnoses and findings of plaintiff's treating physicians [see supra, Part V.A.] appear to be consistent, or at least not inconsistent, with plaintiff's alleged symptoms.  Nevertheless, the ALJ does not identify the absent abnormal clinical signs and diagnostic findings that would have been consistent with plaintiff's alleged symptoms. Regarding the diagnostic imaging of the lumbar spine, the February 2011 CT showed lumbar disc disease and spondylosis.  [AR at 613, 619.]  As a result, a neurosurgeon sent plaintiff for an MRI, which showed varying degrees of mild disc dehydration and mild disc height loss in the lumbar spine, and mild to moderate facet arthritic changes throughout the lumbar spine, worsening caudally [AR at 614, 617], gave him a lumbar facet block [AR at 614], sent him for physical therapy, and prescribed pain medication.  [AR at 614.]  Dr. Sri assessed plaintiff with degenerative disc disease of the lumbar spine, with a bulge at L4-L5, after his examination of plaintiff and his review of plaintiff's CT scan.  [AR at 719-25.]

Based on the foregoing, the Court concludes that the lack of objective medical evidence, in the circumstances here, was not a specific, clear and convincing reason to discount plaintiff's subjective statements.

### 5.    Findings and Conservative Treatment

The ALJ discounted plaintiff's credibility because "the diagnoses, prognoses, and generally conservative treatment regimens prescribed by [plaintiff]'s treating physicians" were "generally inconsistent" with plaintiff's subjective symptoms.  [AR at 22.]  As discussed infra, Part V.A.,

1    plaintiff's treating providers, Dr. Sri, Dr. Villanueva, and Dr. Archambeault, made numerous

2    findings.  Dr. Sri's diagnoses of degenerative disc disease of the lumbar spine with protrusion of

3    L4-L5 with nerve impingement and sciatica were not inconsistent with plaintiff's subjective

4    symptoms of severe back pain and limited ability to sit, stand, and walk.  [AR at 718-19, 826-28,

5    908-09.]  Similarly, the Universal Pain Management treatment records, which reflect plaintiff's

6    treatment for chronic low back pain, and findings of difficulty with mobility, decreased extension

7    and flexion of the low back, and periodic positive straight leg raising test results, were not

8    inconsistent with plaintiff's subjective symptoms and physical limitations.   [AR at 669-711.]

9    Likewise, the Palmdale Mental Health Center treatment records, which reflect treatment for panic

10   disorder with agoraphobia, mood disorder, not otherwise specified, and findings of some irritability

11   and a depressed mood, were not inconsistent with plaintiff's unwillingness to drive due to panic

12   attacks, and stated inability to get along with supervisors.  [AR at 737, 750, 859, 862, 864, 867.]

13       Regarding plaintiff's treatment, the ALJ noted that plaintiff was prescribed "only

14   conservative treatment including a therapeutic back brace to use as needed, lumbar facet blocks,

15   and physical therapy."  [AR at 23.]  An ALJ may properly rely on the fact that only routine and

16   conservative treatment has been prescribed.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir.

17   1995).  "Conservative treatment" has been characterized by the Ninth Circuit as, for example,

18   "treat[ment] with an *over-the-counter pain medication*" (see, e.g., Parra v. Astrue, 481 F.3d 742,

19   751 (9th Cir. 2007)) (emphasis added); Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008)

20   (holding that ALJ properly considered the plaintiff's use of "conservative treatment including

21   physical therapy and the use of anti-inflammatory medication, a transcutaneous electrical nerve

22   stimulation unit, and a lumbosacral corset")), or a physician's failure "to prescribe . . . any serious

23   medical treatment for [a claimant's] supposedly excruciating pain."  Meanel v. Apfel, 172 F.3d

24   1111, 1114 (9th Cir. 1999).

25       Here, there is evidence that plaintiff's treatment has not been conservative, in that it

26   includes emergency care [AR at 316, 785, 792, 797, 869-95], a CT and MRI of the lumbar spine

27   [AR at 617, 619], pain management therapy [AR at 669-715], a lumbar facet injection at L3-S1 that

28   required plaintiff be placed under anesthesia [AR at 608], and recommendations for repeat lumbar

1  facet injections.[16]  [AR at 670, 673, 678, 681, 684.]  Plaintiff's back pain was treated with
2  prescription pain medications such as Oxycontin, Vicodin, and Norco, and his treatment options
3  were noted to be "limited by the fact [plaintiff] does not have insurance."  [AR at 675, 678.]  In light
4  of the ALJ's failure to identify how plaintiff's treatment is conservative, or how his treatment is
5  "inconsistent" with his testimony, this factor does not support the ALJ's credibility determination.
6  See Childress v. Colvin, 2014 WL 4629593, at *12-13 (N.D. Cal. Sept. 16, 2014) (remanding
7  where ALJ failed to adequately explain conclusion of routine and conservative treatment).  Based
8  on the foregoing, the Court cannot conclude that this was a specific, clear and convincing reason
9  to discount plaintiff's subjective statements.

10

11          **6.    Observations of Administration Personnel**

12          The ALJ discounted plaintiff's credibility based on "the contradicting observations of
13  administration personnel who noted that [plaintiff] had no difficulty speaking and thinking
14  coherently, concentrating, or understanding and answering questions."  [AR at 22 (citing AR at
15  255-57)]; Social Security Ruling ("SSR")[17] 96-7p ("[t]he adjudicator must also consider any
16  observations about the individual recorded by Social Security Administration employees during
17  interviews, whether in person or by telephone"); see also Wyerman v. Astrue, 2012 WL 5306236,
18  at *2 (C.D. Cal. Oct. 26, 2012) (discrediting claimant with observations from agency employee)
19  (citation omitted).  The ALJ cited the observations of administration personnel in the Disability
20  Report -- Field Office, dated April 17, 2012.  [AR at 22.]  The interview was conducted via
21  "[t]eleclaim with [plaintiff]."  [AR at 256.]  The interviewer wrote "No" in the section asking whether
22  plaintiff had difficulty with hearing, reading, breathing, understanding, coherency, concentrating,
23  talking or answering.  [Id.]  The interviewer also wrote that plaintiff "was conversational and polite."

24

25      [16]  Plaintiff stated that he would have had repeat lumbar injections if they were covered by medical insurance.  [AR at 669, 681.]

26      [17]  "SSRs do not have the force of law.  However, because they represent the Commissioner's
27  interpretation of the agency's regulations, we give them some deference.  We will not defer to SSRs
   if they are inconsistent with the statute or regulations."  Holohan v. Massanari, 246 F.3d 1195, 1202
28  n.1 (9th Cir. 2001) (internal citations omitted).

[AR at 257.]   Here, plaintiff testified about short-term memory problems, and alleged in the Function Report -- Adult that his conditions affect his memory, concentration, and understanding. [AR at 41, 271.]  He did not allege that his conditions affect his speaking, hearing, breathing, or coherency.   [AR at 271.]   As the subject interview was not conducted in person, under the circumstances here, with no ability to verify the basis of the "observations," the Court does not find this to be a convincing reason to discount plaintiff's subjective statements.

### 7.    Receipt of Unemployment Benefits

The ALJ discounted plaintiff's credibility based on plaintiff's "reported receipt of unemployment benefits (which requires an individual to certify that he is willing to work and able to work, an assertion fundamentally at odds with allegations of disabling symptoms) between approximately February 2011 and February 2012."[18]  [AR at 22 (citing AR at 756).]   In the consultative examination report dated August 11, 2012, Dr. Lee wrote:  "[plaintiff] stopped working in February 2010 and has [sic] on disability benefits for one year and he has been [sic] under unemployment benefits the year after that.   At the present time, [plaintiff] has no source of income."  [AR at 756.]  Plaintiff argues that "a statement in the consultative examiner's report about receipt of benefits is not enough" to prove that plaintiff received unemployment benefits. [JS at 37.] However, based on plaintiff's statement to Dr. Lee, it was reasonable for the ALJ to infer that plaintiff collected unemployment benefits after the alleged onset date, although the exact dates are unclear.   [See also AR at 749 (plaintiff reported on August 7, 2012, that he was on unemployment and was applying for disability).]

Accordingly, the Court finds that although this was a specific reason for discounting plaintiff's subjective statements, the ambiguity renders it not convincing.

---

[18]    A requirement for unemployment compensation is that the individual be "able to work and available for work that week."  Cal. Unemp. Ins. Code § 1253(c).

### 8.      Work History and Earnings Record

The ALJ discounted plaintiff's credibility based on plaintiff's "somewhat inconsistent work history and earnings record, even prior to the alleged onset of disability." [AR at 22.]  In weighing a claimant's credibility, an ALJ may consider the claimant's prior work record and efforts to work. SSR 96-7p; see also Thomas, 278 F.3d at 958-59.  Here, the ALJ did not specify what he meant by a "somewhat inconsistent work history and earnings record." [AR at 22.]  According to plaintiff's work history report, prior to the onset date, plaintiff was self-employed as an electrician from April 1988 to March 2011, while holding a number of other jobs.  [AR at 219, 233.]  Given the ALJ's vague reference to plaintiff's work history and earnings record, plaintiff's work history and earnings record does not clearly and convincingly detract from his credibility.  See Lewis v. Astrue, 2010 WL 3701782, at *5 (C.D. Cal. Sept. 14, 2010) (holding that the claimant's "spotty work history" did not amount to "a clear and convincing reason for rejecting [his] credibility" where claimant worked "to some degree" most of the years prior to the disability onset date).

Accordingly, the Court cannot conclude that this was a specific, clear and convincing reason to discount plaintiff's subjective statements.

### 9.      Conduct at the Hearing

The ALJ discounted plaintiff's credibility because plaintiff "demonstrated sufficient attention and concentration" at the hearing. [AR at 22.]  The hearing lasted thirty-nine minutes and it cannot be gleaned from the transcript whether plaintiff had any difficulty in attention or concentration at the hearing.  [AR at 38-59.]  Moreover, the Court notes that plaintiff's testimony took up only a portion of the hearing time, and the questions were short and focused.  [AR at 40-51.]  The ALJ may properly consider his own observations at the hearing as part of the credibility analysis.  Orn, 495 F.3d at 639 (ALJ's personal observations may be used in "the overall evaluation of the credibility of the individual's statements") (citation omitted); Nyman v. Heckler, 779 F.2d 528, 531 n.1 (9th Cir. 1985) ("The ALJ's observation of [the claimant]'s demeanor was relevant to his credibility and was not offered or taken as a substitute for medical diagnosis."); SSR 96-7p (explaining that the ALJ may "consider his or her own recorded observations of the individual as

part of the overall evaluation of the credibility of the individual's statements"). However, the Court finds that this was not a clear and convincing reason for discounting plaintiff's credibility, given the ALJ's lack of explanation and the short duration of plaintiff's testimony.

### 10.   Conclusion

In sum, the Court finds that it was error to discount plaintiff's credibility based on plaintiff's daily activities, plaintiff's statements to his physicians, the opinions of the examining and non-examining physicians, the lack of supporting objective medical evidence, conservative treatment, the observations of administration personnel, plaintiff's receipt of unemployment benefits, plaintiff's "inconsistent" work history and earnings record, and plaintiff's conduct at the hearing.

Accordingly, the Court concludes that the ALJ failed to provide specific, clear and convincing reasons for discounting plaintiff's subjective symptom testimony. Remand is warranted on this issue.

### C.   CREDIT-AS-TRUE STANDARD

Plaintiff argues that the Court should apply the credit-as-true standard. [JS at 37.] As addressed below, the Court declines to apply the credit-as-true standard.

## VI.

### REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits. McAllister, 888 F.2d at 603. Where (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand, it is appropriate to exercise this discretion to direct an immediate award of benefits. Garrison v. Colvin, 759 F.3d 995, 1020 (9th Cir. 2014) (setting forth the three-part credit-as-true standard for exercising the Court's discretion to remand with instructions to calculate and award

1   benefits); see also Lingenfelter, 504 F.3d at 1041; Benecke v. Barnhart, 379 F.3d 587, 595-96 (9th

2   Cir. 2004).  Where there are outstanding issues that must be resolved before a determination can

3   be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled

4   if all the evidence were properly evaluated, remand is appropriate.  See Benecke, 379 F.3d at

5   59396; see also Connett v. Barnhart, 340 F.3d 871 (9th Cir. 2003) (cautioning that the

6   credit-as-true rule may not be dispositive of the remand question in all cases, even where all three

7   conditions are met).

8           In this case, as discussed above, the ALJ failed to provide legally sufficient reasons for

9   discounting the opinions of plaintiff's treating physicians and for discounting plaintiff's credibility.

10  The Court finds that remand for further proceedings is appropriate because it is not clear that all

11  the conditions of the credit-as-true rule are satisfied, as further proceedings would be useful to

12  determine if a finding of disability is warranted.

13          In an effort to expedite these proceedings and to avoid any confusion or misunderstanding

14  as to what the Court intends, the Court will set forth the scope of the remand proceedings.  First,

15  because the ALJ failed to provide specific and legitimate reasons for rejecting plaintiff's treating

16  physicians, the ALJ on remand shall reassess the opinions of Dr. Sri, Dr. Villanueva, and Dr.

17  Archambeault.  In assessing the medical opinion evidence of all of these doctors, the ALJ must

18  provide legally adequate reasons for any portion of an opinion that the ALJ discounts or rejects,

19  including a legally sufficient explanation for crediting one doctor's opinion over any of the others.

20  Second, because the ALJ failed to provide clear and convincing reasons to discount plaintiff's

21  credibility, the ALJ on remand shall reassess plaintiff's subjective symptom allegations and either

22  credit his testimony as true, or provide specific, clear and convincing reasons, supported by

23  substantial evidence in the case record, for discounting or rejecting any testimony.  Next, if

24  necessary, the ALJ shall reconsider all of plaintiff's limitations in making his RFC determination.

25  Finally, the ALJ shall determine, at step five, with the assistance of a VE if necessary, whether

26  there are jobs existing in significant numbers in the national economy that plaintiff can still

27

28

perform.[19]

## VII.

## <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: APRIL 17, 2015

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

---

[19]    Nothing herein is intended to disrupt the ALJ's step four finding that plaintiff is unable to return to his past relevant work.